IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TRAVIS TERRY,   *

Plaintiff   *

v   *   Civil Action No. PWG-18-726

WARDEN FRANK B. BISHOP, JR., *et al.*,   *

Defendants   *

\*\*\*

## MEMORANDUM OPINION

Plaintiff Travis Terry filed this civil rights action seeking two forms of injunctive relief: first, his removal from the North Branch Correctional Institution ("NBCI") and, second, the return of his prosthetic leg. Compl. 1, ECF No. 1. The Complaint alleged, in part, that he had been forced to "hop and crawl around on [his] cell floor" since authorities confiscated the prosthetic leg. *Id.* It also included allegations that a magnet had been placed over the window to his cell door, that he had been sleep deprived because the light in his cell had been left on all night, and that his mail had been tampered with. *Id.* Given the seriousness of these allegations, I directed counsel for the Division of Corrections to show cause why relief should not be granted. ECF No. 4.

Counsel for the Division of Corrections promptly filed a response supported by statements under oath and verified business records indicating that Plaintiff was not entitled to a preliminary injunction. ECF No. 6. After seeking an extension of time, which was granted, Plaintiff filed a reply (ECF No. 9), and counsel for the Division of Corrections responded (ECF No. 10).

The matter is now ripe for review. The Court finds a hearing unnecessary. *See* Local Rule 105.6 (D. Md. 2018). As Plaintiff has not shown that any of his claims are likely to succeed on the merits or that he will suffer irreparable harm unless the Court grants him the relief he seeks, his request for preliminary injunctive relief shall be denied and the Complaint dismissed without

prejudice.

I. **BACKGROUND**

On April 10, 2017, while incarcerated at NBCI, Plaintiff stabbed Officer James Vinci with a five-inch piece of metal sharpened to a point. Incident Report 4, 20, 29, 42, ECF No. 6-1. Following the assault, officers seized the weapon and completed a chain-of-custody form. *Id.* at 4, 29. Plaintiff was strip searched, and a second weapon, a 5.5-inch metal shank, was found in the rubber boot of his prosthetic leg. *Id.* at 4, 19, 23, 30, 41. Plaintiff was charged in the Circuit Court for Allegany County, Maryland with attempted first-degree murder, attempted second-degree murder, first- and second-degree assault, and weapons offenses. State Ct. Docket 1-4, ECF No. 6-3. The weapons and prosthetic leg were turned over to the Maryland State Police as evidence, and as of the filing of Defendants' response to the Order to Show Cause, the prosthetic leg continued to be held as evidence. *See* Incident Report 29-30; Cutter Decl. ¶ 3, ECF 6-2. A declaration provided by Captain Joseph H. Cutter Jr. of the Maryland Department of Public Safety and Correctional Services stated that the prosthetic leg "will be returned" to Plaintiff after the conclusion of the criminal trial. Cutter Decl. ¶ 3.

On April 11, 2017, the day after the attack, Plaintiff was transferred to Western Correctional Institution. (WCI). *See* ECF No. 6-4. He remained there for several months. Then, in October 2017, Plaintiff's classification was reviewed and it was recommended that his security classification be increased to Maximum Security Level II ("Max II"). ECF No. 6-5. It was also recommended that Plaintiff be considered for Maximum II-Structured Housing[1] ("MAX II SH")

---

[1] A Maximum II-Structured Housing inmate is defined as an inmate who, among other things, "demonstrates or is known to demonstrate dangerous, violent, or other characteristics that pose a serious threat to life, property, self, staff, other inmates or facility security" if housed among the

2

at a later date. *Id.* Accordingly, on October 11, 2017, based upon the recommendation of WCI Warden Richard Graham, Jr., Plaintiff was transferred back to NBCI. *See id.*; ECF No. 6-4. NBCI is the only correctional institution in Maryland that houses Max II-structured housing inmates. Bohrer Decl. ¶ 3, ECF No. 6-6. Plaintiff's offender case management sheet lists him as security level "Max II" and indicates he is on disciplinary segregation. ECF No. 10-3.

Inmates at NBCI receive medical services from a private medical contractor. *See* Bishop Decl. ¶ 2, ECF No. 6-7. In an April 23, 2018 declaration, NBCI Warden Frank Bishop stated that Plaintiff "will receive a new prosthetic leg if the private medical contractor deems one medically necessary and orders one." *Id.* ¶ 3. Plaintiff indicates that on January 25, 2018, Dr. Ashraf wrote an order that Plaintiff be re-issued a prosthetic leg. Pl.'s Reply 2, ECF No. 9. Plaintiff was evaluated on March 13, 2018, by Ability Prosthetics and Orthotics for a new prosthetic leg. *See id.*; ECF No. 11-1. Warden Bishop has averred that he has no personal involvement in the provision of medical care to any NBCI inmate. *See* Bishop Decl. ¶ 2. Bishop has "no authority" to order medical staff to perform a particular procedure, render a particular treatment, or recommend any procedure or treatment. *Id.*

Whenever Plaintiff is moved out of his cell he is transported via wheelchair. *See* Reikie Decl. ¶ 4, ECF No. 6-8. Since October 17, 2017, Plaintiff has been housed in a medical cell that

---

general population. Facility Directive 2, ECF No. 6-11. The directive governing Maximum II-Structured Housing inmates indicates that an inmate approved for MAX II SH must complete any disciplinary sanction imposed by the inmate disciplinary process before being assigned to MAX II SH. *Id.* at 3.

In his opposition response, Plaintiff asserts that he is on disciplinary segregation and that he has not been evaluated as a Maximum II Structured Housing inmate. *See* Pl.'s Reply 2, 4. Plaintiff further explains that he was removed from NBCI to WCI after the assault on Officer Vinci because of concerns for his safety and that returning him to NBCI only six months after the assault posed a threat to his safety. *See id.* at 3.

has a single bed and is closest to the tier shower. See Dolly Decl. ¶ 4, ECF No. 10-2. Plaintiff counters that the medical provider has not issued any paperwork for him to use a wheelchair when exiting his cell and therefore he is at the mercy of correctional staff. *See* Pl.'s Reply 2. He has also provided a declaration from inmate Scotland Williams averring that Plaintiff's requests for a wheelchair to go to the handicap shower or for outside exercise were frequently denied. Williams Decl. ¶¶ 1, 7, ECF No. 9-4. Plaintiff states that he is not permitted the use of a wheelchair inside his cell, leaving him to crawl or hop around his cell, which is not handicapped-accessible. Pl.'s Reply 6.

As to Plaintiff's contention that a magnet has been placed over his cell door, Correctional Officer Joshua Reikie's declaration explains that a magnet is placed over an inmate's door window when the inmate is disruptive. *See* Reikie Decl. ¶ 5. Plaintiff's record of segregation confinement indicates that despite Plaintiff's regular disruptive conduct on the tier, a magnet was placed over Plaintiff's cell window on only one occasion, December 20, 2017.[2] Segregated Confinement R. 3, ECF No. 6-9.

Officer Reikie, who is assigned to the 3-11 shift on the housing unit where Plaintiff has been housed since October 2017, averred that he had "never observed Inmate Terry's cell light being left on for an extended time to disrupt his sleep during [his] shift." Reikie Decl. ¶ 6.

---

[2] Plaintiff asserts that a magnet was placed over his cell door window on November 20, 2017, December 24, 2017, and January 5, 2018. Pl. Reply 2, ECF No. 9. The segregation confinement notes for November 20, 2017, do not indicate that a magnet was placed on Plaintiff's door. Segregated Confinement R. 2. Likewise, there is no indication a magnet was place on the door on December 24, 2017. *See id.* at 3. On January 5, 2018, Plaintiff was described as cursing at officers and being disruptive on the tier. *See id.* at 4. He was on staff alert and was described as repeatedly refusing to follow procedures during feed up. *See id.* However, there is no note in the record indicating that a magnet was placed on his door.

4

As to Plaintiff's complaints about his meals, his record of segregation confinement demonstrates that he regularly refused meals or refused to comply with staff alert protocols for meal delivery. *See* Segregated Confinement R. In 2017, Plaintiff refused meals on seven days in October, 16 days in November, and seven days in December. *See id.* at 1-3. In 2018, he refused meals on six days in January, six days in February, 13 days in March, and one day in April. *See id.* at 4-8.

Plaintiff does not expressly deny that he declined the meals. Pl. Reply 5. He argues, though, that staff are trained that if an inmate misses "a certain amount of meals medical and mental health are to be notified." *Id.* He argues that since no referral was made, the officers must have refused to serve him. *Id.*

## II. ANALYSIS

A preliminary injunction is an extraordinary and drastic remedy. *See Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the party's favor; and (4) the injunction is in the public interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989)). In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir.

1994). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).

Plaintiff has not sustained his burden of demonstrating that his requested injunctive relief is warranted. Indeed, the record, viewed most favorably to Plaintiff, does not demonstrate that he is likely to suffer irreparable harm in the absence of a preliminary injunction. Plaintiff is housed in a medical cell, has access to a wheelchair outside of his cell, and is being provided a replacement prosthetic leg. As to his retaliation claims, the record shows that Plaintiff is housed on disciplinary segregation where, despite his regular and repeated disruption of the tier, he receives regular meals and access to showers and laundry.

Plaintiff also has failed to establish a likelihood of success on the merits. The Eighth Amendment, as incorporated by the Fourteenth Amendment, prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (plurality opinion). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to "deliberate indifference" to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it. . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences."

*Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999).

"[D]eliberate indifference requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" *Id.* at 696 (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). In cases like this, there must be a showing that, objectively, the prisoner was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)). The subjective component is satisfied only where a prison official "subjectively 'knows of and disregards an excessive risk to inmate health or safety.'" *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer*, 511 U.S. at 837); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk.").

If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. The reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001). The patient's right to treatment is "limited to that which may be provided upon a reasonable cost and time basis

and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977).

Subjectively, the confiscation of Plaintiff's prosthetic leg did not amount to an act or omission "for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. The record before me fails to show that correctional staff exhibited a callous disregard for a serious medical need. *See Estelle*, 429 U.S. at 105-06. Rather correctional employees have followed the directives of medical staff who ordered that Plaintiff be housed in a medical cell and that he be fitted for a new prosthetic. And it is clear that the purpose of confiscating the original prosthetic was not to retaliate against Plaintiff or otherwise cause him harm. Rather, it was confiscated as part of a criminal investigation occasioned by Plaintiff's attack on a correctional officer with a homemade weapon. Plaintiff was found to have a second weapon hidden within the prosthetic, which was seized as evidence. On these facts, viewed most favorably to Plaintiff, he cannot demonstrate that the confiscation and withholding of his prosthetic leg were the product of a callous disregard for a serious medical need. The request for injunctive relief seeking the return of his prosthetic leg must be denied.

Nor can Plaintiff demonstrate a likelihood of success on the merits of his claim that he was transferred to NBCI and dealt with in a retaliatory manner due to his assault on a correctional officer. In order to prevail on a claim of retaliation, Plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994).

> Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Where there is no impairment of the plaintiff's

rights, there is no need for the protection provided by a cause of action for retaliation. Thus, a showing of adversity is essential to any retaliation claim.

*ACLU of Md., Inc. v. Wicomico Cty.*, 999 F.2d 780, 785 (4th Cir. 1993).

"In the prison context, we treat such claims with skepticism because 'every act of discipline by prison officials is by definition "retaliatory" in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (quoting *Adams*, 40 F.3d at 74). "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Gill v. Mooney*, 824 F.2d 192, 194 (2nd Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)); *Webster v. Russell*, No. 16-487, 2018 WL 4515888, at *2 (W.D. Va. Sept. 20, 2018).

Plaintiff has failed to allege that his move from WCI to NBCI was taken in response to his exercise of a constitutional right. Moreover, he does not have a protected liberty interest in avoiding assignment to NBCI. It is well established that prisoners do not have a constitutional right to access programs or to demand to be housed in one prison verses another, absent a showing of significant hardship. "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Meachum v. Fano*, 427 U.S. 215, 224 (1976); *see also Sandin v. Conner*, 515 U.S. 472, 484 (1995) (requiring an atypical and significant hardship as prerequisite to creation of a constitutionally protected liberty interest).

The record evidence demonstrates that Plaintiff was transferred from WCI to NBCI six months after his assault on the correctional officer due to an increase in his security classification

– not, as he alleges, for any retaliatory reason. Plaintiff has not demonstrated an atypical and significant hardship resulting from his transfer to NBCI. As he would be housed on disciplinary segregation regardless of which prison he was housed in, he has failed to show that he has suffered a hardship by his being housed on disciplinary segregation at NBCI. Nor does the evidence reflect that Plaintiff has been treated differently than any other Max II inmate assigned to disciplinary segregation, making his claims of retaliation dubious at best. As prisoners have no liberty interest in being housed in any particular facility or being placed in a particular status, *see Olim v. Wakinekona*, 461 U.S. 238, 244-45 (1983), Plaintiff cannot demonstrate that he is likely to succeed on the merits of his claim. His request that he be transferred out of NBCI is denied.

Plaintiff has solely requested injunctive relief. Compl. Given that the denial of Plaintiff's requests for injunctive relief resolves the matters currently before the Court, the Clerk will be directed to close this case. A separate Order follows.

Date: May 31, 2019

/S/
Paul W. Grimm
United States District Judge